## 11226

### SCHEPER *ET AL.* v. CLARK *ET AL.*

#### (117 S. E., 599)

1. Turnpikes and Toll Roads—Turnpike Company's Attempted Sale
   of Interest in Land Held Ineffective Because Executed After
   Expiration of Company's Charter.—An attempted conveyance by
   a turnpike company of a strip of land along its highway more than
   six years after the expiration of its charter *held* not to convey any
   interest, since at the time of its execution the turnpike company
   was incapable of entering into any kind of a contract.

2. Turnpikes and Toll Roads—Devoting Highway to Public Use
   by Turnpike Company is Dedication Thereof Which Cannot be
   Revoked Upon· Expiration of Company's Charter.—A turnpike
   company by acceptance of its charter and operation under it in the
   collection of tolls on a particular highway dedicates · the road to
   public use, which dedication cannot be revoked by the company
   upon the expiration of its charter, and this though the company
   may have owned the fee.

3. Turnpikes and Toll Roads—If Turnpike Company Possesses Only
   Easement in Highway, Such Easement is Inalienable and Con-
   tinuous in Public After Lapse of Company's Charter.—If a
   turnpike company operating a highway for the use of the public be
   deemed to have taken only an easement in the land by the deed to·
   it, such easement is inlienable and continuous in the public upon the
   expiration of the turnpike company's charter, so that the 'grantee
   under an attempted conveyance by it takes no interest.

4. Turnpikes and Toll Roads—Upon Establishment of Turnpike
   Abutting Property Owners Acquire Rights Indefeasible by Any
   Act of the Company in Conveying a Strip of its Roadway.—

Upon the establishment of a highway by a turnpike company un-
der authority of its charter, the abutting property owners acquire
rights, and during its life the company cannot convey a strip of its
roadway so as to effectually annihilate the rights of such abutting
owners to uninterrupted access to the roadway.

Before PRINCE, J., Beaufort, December, 1921. Reversed
with directions.

Action by F. W. Scheper *et al.* against E. G. Clark *et al.*
Judgment for plaintiffs and defendants appeal.

The following is the ruling of the presiding Judge on
plaintiff's motion for a directed verdict referred to in the
opinion:

Mr. Foreman, plaintiff comes into the Court and seeks to
recover of the defendant a portion—a strip of land—two
strips of land—one strip, I believe, is only in the controversy
—two strips of 15 feet on each side of the public highway
running to the depot and Port Royal.   They have introduced
deeds to show that this had been conveyed to the plaintiffs
and some of their ancestors, the parties to whom the con-
veyance was had, and their heirs-at-law, and the heirs-at-law
are here representing their shares and claiming this land.
The above counsel for defendant has tried to prove that this
is a part of the public highway of the county, that the public
has used for 20 years or more as a public highway.   Well,
in so far as it has been used, he is right; one of these turn-
pike roads—it was a turnpike road, and a turnpike road in
a sense is a public highway.   Well, when the charter expired,
why the public continued to use the part that has been used
for a highway as a highway, and the public to that part has
acquired title, but yet it seems that it has been previously
conveyed, or whether it was conveyed by the deeds put in
evidence by the County Commissioners.   So the County
Commissioners acquired title to 30 feet.   Therefore, there
being nothing to the contrary, I direct you to find a verdict
for the plaintiff in this case, because no evidence that the
public ever used the 15 feet, no evidence that the shell road
was over 60 feet.   The only evidence that it was 19 or 20

feet, and that trees of considerable size grew on the outside of this place. They could not have grown there in less than 20 or 25 years, so there is no evidence that it was ever used as a highway outside of this thirty feet. I agree with defendants counsel that nobody could dispose of what the public has acquired the right to use, but there is no evidence that the public had acquired the right to use or insisted upon the right to use in excess of 30 feet—is no evidence that the defendant had any right to any portion of this thing. He has not proved any better right than the plaintiff has. So write a verdict, we find for plaintiff the land in dispute.

*Mr. W. J. Thomas,* for appellants, cites: *A turnpike road becomes a public road after expiration of franchise:* 29 A. & E. Enc. L. (2d Ed.), 3, 5; 164 U. S., 595; 38 Cyc., 378-9, 384-5. *Power of president of corporation:* 21 A. & E. Enc. L. (2d Ed.), 850, 860.

*Mr. George W. Beckett,* for respondents, cites: *Width of road bed* 20 *feet:* 1 Civ. Code 1902, Sec. 1336. *No obstruction could be placed nearer than half of width:* 2 Speer 162. *Maximum width* 40 *feet:* 1 Civ. Code 1902, Sec. 1426. *After expiration of charter company still existed to wind up affairs:* 1 Civ. Code 1912, Sec. 2814, 2815.

May 14, 1923.

The opinion of the Court was delivered by MR. JUSTICE COTHRAN.

Action for the recovery of a strip of land 15 feet wide and 1,530 feet long, lying adjacent to and on the south side of a certain road or street in the City of Beaufort, with $550 damages.

The contention of the plaintiffs is that on May 26, 1902, an agreement was entered into between the Beaufort & Port Royal Turnpike Company (which will be referred to as the turnpike company), party of the first part, and the County Commissioners of Beaufort County, the Town of Beaufort, James M. Crofut and wife, Charles E. Danner & Co., George

Holmes, and F. W. Scheper, parties of the second part, whereby, in consideration of $500 paid by the County Commissioners, $300 by the Town of Beaufort, $100 by Crofut and wife, and $150 by Danner & Co., Long, Holmes, and Scheper, and $350 by the citizens of Beaufort County, the turnpike company was to convey to the County of Beaufort and the individuals named, Danner & Co., Long, Holmes, and Scheper, a certain strip of land 60 feet in width and about 1,530 feet in length, which had been conveyed to the turnpike company by Lewis R. Sams on April 17, 1877, "formerly used by it as a roadway"; that it was agreed at the time that the County Commissioners would take the middle 30 feet of the 60-foot strip, and that Danner & co., Long, Holmes, and Scheper would take the two outside 15-foot strips; that the money was paid to the turnpike company, amounting to $1,400, as agreed, by the several parties named; that in December, 1912 (which it will be noticed was 10 years, nearly 11, after the alleged agreement was entered into, and 16 years after the charter of the turnpike company had expired), the turnpike company, by George Holmes, President (one of the individual parties to the alleged agreement of May 26, 1902), and W. F. Marscher, Secretary, executed a deed reciting the aforesaid agreement, and conveying the said 60-foot strip to the County Commissioners, Danner, Long, Holmes, and Scheper, divided among them as above indicated.

It seems that the whole of the 60-foot road was then abandoned by the turnpike company. A part of it was within the corporate limits of the Town of Beaufort, and the other in the County. The County assumed jurisdiction of that part of the 30-foot strip that lay outside, and the town that part that lay within the town. It does not appear that the individual parties went into possession of either of the 15-foot strips.

It is alleged in the complaint that in April, 1916, the plaintiffs, claiming that they were the owners of the two 15-foot

strips, leased the one on the south side of the road or street in the Town of Beaufort to said Town (or City), and that in January, 1919, the defendant Clark took possession thereof, excluded the plaintiffs therefrom, and has made it impossible for the plaintiffs to keep their agreement with the city.

At the close of the evidence, which tended to sustain the foregoing contentions of the plaintiffs, the defendants moved for a nonsuit, which was refused. The record does not show who the defendants other than Clark were, the title showing only "et al." At the close of all the evidence both plaintiffs and defendants moved for directed verdicts. The motion of the defendants was refused, and that of the plaintiffs granted. (The ruling of the presiding Judge upon the motion will be reported.) From the judgment entered upon this directed verdict the defendants have appealed upon grounds going to the refusal of the motion for nonsuit and the granting of the plaintiffs motion for a directed verdict; they fairly raise the matters hereinafter discussed.

The record for appeal leaves somewhat in doubt the extent and location of the 60-foot strip conveyed by Sams to the turnpike company and the location of the alleged trespass by Clark. From the allegations of the complaint and the arguments of counsel it may fairly be inferred that the strip began at a point within the City of Beaufort extended to the corporate limits, and thence into the jurisdiction of the County Commissioners, and that the locus of the present controversy is within the City of Beaufort. It may be assumed also that there are property owners whose lots fronted the turnpike as it was originally projected; and to sustain the contention of the plaintiffs would be to vest in them title to a strip 15 feet wide lying between these fronts and the new location of the road or street 30 feet wide, effectually cutting them off from access to the street, and without the possibility of recovering it by condemnation. This

consummation should not be allowed effect except under the compulsion of the law.

From the very crude minutes of the meeting of the County Commissioners of May 26, 1902, it appears reasonably certain that a verbal agreement had been entered into between the turnpike company, whose charter had expired in 1896, 6 years before, and who were anxious to dispose of the turnpike, as a party on the one side, and the County Commissioners, the Town of Beaufort, certain citizens of Beaufort and Port Royal, and Danner, Long, Holmes, and Scheper, parties on the other, by which the turnpike company would sell all of their right, title, and interest "in the 60 feet of road owned by them" for $1,400; that this $1,400 was to be paid, by the County, $500, by the Town, $300, by certain citizens, $350, by Crofut and wife, $100, and by Danner, Long, Holmes, and Scheper, $150; that Crofut and wife were to receive as consideration for their $100 a deed from the County Commissioners to a portion of a certain road (described) which presumably was laid off on their land, practically a discontinuance or abandonment of that part of a public highway; that Danner, Long, Holmes, and Scheper were to receive as consideration for their $150 a deed, presumably from the turnpike company, to "fifteen (15) feet on each side of the road purchased for [from?] the turnpike company, being that part of the road not shelled and not in use, and also [presumably from the County] fifteen (15) feet on each side of the sixty (60) feet of road conveyed to the County by the estate of Geo. Waterhouse, said road being formerly under a lease to the turnpike company;" as a part, also of the agreement the estate of Waterhouse was to convey to the County roadway then under lease to the turnpike company in exchange for a deed from the County to a certain road laid out upon the Waterhouse property.

So it appears that the agreement contemplated a conveyance by the turnpike company to Danner and his associates

named above of the two 15-foot strips and by the County to Danner and his associates of like strips of the Waterhouse road, by the County to Crofut of a part of the County's Highway, and by the County to Waterhouse of a part of the County Highway.

No objection to the introduction of these minutes was interposed, as failing to evidence an agreement between the turnpike company and Danner and his associates. The turnpike company was not a party to the minutes of the County Commissioners and there is nothing in them that proposes to bind the turnpike company. So far as that company is concerned, the evidence is hearsay, and upon objection should have been ruled out, so far as it was claimed to support the existence of a verbal agreement, independently of the inhibition of the statute of frauds.

But, assuming for the sake of the argument that the evidence established the verbal agreement that the turnpike company, in consideration of the $150 contributed by Danner and his associates, would convey to them the 15-foot strip in controversy, it was not such an agreement as could be enforced for several reasons.

1 In the first place, the agreement was made in 1902. The company's charter was dated in 1876, for a period of 20 years. It expired in 1896, 6 years before the date of the alleged agreement. It was at the time a lifeless body, incapable of entering into any kind of contract.

In 14 C. J., 1099, it is said:

"After the period of existence of a corporation has expired by force of express provision in the charter, or in a general law, and in the absence of any statutory provision authorizing its extension or continuance, it becomes *ipso facto* dissolved, and no longer has any existence at all, either *de jure* or *de facto,* for there is no law under which it can longer exist."

In *Miller v. Coal Co.,* 31 W. Va., 836, 8 S. E., 600; 13 Am. St. Rep., 903, it is said:

"In their charter the days of their existence are numbered and the very period of their dissolution fixed. If the charter be not extended, the very moment that period arrives the corporation stands, not dormant, disabled, or incapable of action merely, but absolutely dissolved, civilly dead, without life or being and altogether at an end."

In 7 R. C. L., 735, it is said:

"The dissolution of a corporation implies its utter extinction and obliteration as a body. * * * Dissolution terminates its power to hold property, to receive a grant or make a contract."

See note, 134 Am. St. Rep., 310.

In the second place, upon the expiration of its charter the highway reverted as such to the State or County or City, as a highway, and thereafter the defunct corporation was powerless to dispose of it or any part of it.

It is contended that the deed of Sams to the turnpike company executed in 1877 conveyed the fee-simple title to the 60-foot strip. In view of the terms of the charter this proposition is exceedingly doubtful. The charter gives the company plenary powers in the first instance to acquire real estate and other property, but it contains the following provision:

"That the said company shall be * * * authorized and empowered to establish and maintain a turnpike road * * * which shall be vested in said corporation, their successors and assigns, for a terms of twenty years,"

—which apparently limits the acquisition of the title of the road, but to an easement merely. But assuming that it conveyed the fee, it is clear from the authorities that the acceptance of the charter and operation under it in the collection of tolls constituted a dedication of the road to public use, that

that dedication could not be revoked by the company, and that, upon the expiration of the charter, the dedication continued unincumbered by the company's right to collect tolls.

In *Commissioner of Highways v. Cobb,* 104 Mich., 395; 62 N. W., 554, it is held:

"A dedication to a turnpike road is presumptively made in contemplation of its continued use as a public highway, and implies the right of the public to continue its use on the termination of the corporation"—citing *R. Co v. Atty. Gen.,* 104 Pa., 583. *State v. Maine,* 27 Conn., 641; 71 Am. Dec., 89, Elliott, R. & S. 54.

*In State v. Dayton, etc., Toll Road Co.,* 10 Nev., 155, and *State ex rel. Boardman v. Lake,* 8 Nev., 276, it is held that the owner of a road who allows the public to pass over it, and collects tolls therefor, dedicates it to the public use, subject only to the collection of tolls while he may lawfully do so.

In *McMullin v. Leitch,* 83 Cal., 239; 23 Pac., 294, in respect to a road built by a corporation, it was held that the road became a public highway by dedication, subject to the right to collect tolls for a limited period, and that on the expiration of the period the dedication to the public remains without any interest for which compensation can be demanded.

In *People v. Davidson,* 79 Cal., 166; 21 Pac., 538, and *People v. O'Keefe,* 79 Cal., 171; 21 Pac., 539, it is held that a road built by an individual on his own land, and on which he has taken toll for many years, the rates being fixed by public authorities, is dedicated to the public.

"When individuals, under a charter from the government construct works for the public accommodation and open [the works] to the use of the public, this is in law a dedication of the works to the public use." *Olcott v. Banfill,* 4 N. H., 537.

If the deed conveyed only an easement, there is no question but that upon the expiration of the charter the highway vested in the public.

In 38 Cyc., 391, it is said:

"Upon the termination of the franchise of a toll road company by expiration of the time limited for corporate existence or by abandonment, revocation, or forfeiture, the title to the road does not revert to the abutting owners, especially where they have conveyed their rights without reservation or limitation in the first instance; but the title and use of the road reverts to the public, or, more accurately speaking, the road, which has been a public highway during the time tolls were collected, continues to be a public highway disburdened of tolls. Any attempted conveyance of the title by the toll road company thereafter is void and ineffectual, and an attempt on the part of the company to close up the road and use it as a private property will be restrained by the Courts."

In *Scott County Co. v. Missouri ex rel Hines,* 215 U. S., 336; 30 Sup. Ct., 110; 54 L. Ed., 221, it was held, affirming 207 Mo., 54, that the company's right was an easement of a public character, and that, after the expiration of the charter, the public had an unincumbered right to the highway.

In *State v. Cape Girardean Co.,* 207 Mo., 85; S. W., 761, it is held that, where the corporate existence of a toll road company terminated by expiration of time, the road and franchise of the corporation vested in the public, so that an alleged deed thereof by the directors of the defunct corporation to the defendant conveyed no title. When a plank road company forfeits its charter or abandons it or suffers the road to become so out of repair as to amount to an abandonment, the right of way of the company ceases, and the road becomes a public highway. *Craig v. People,* 47 Ill., 487.

In *Montgomery v. Turnpike Co.,* 120 Tenn., 76; 109 S. W., 1152, it is held that, upon the expiration of the com-

pany's charter, the public obtained the right to use the turn-pike free of tolls, and the company's control ceased.

In *Pittsburg, etc., R. Co. v. Com.,* 104 Pa., 583, the Court says:

"The question is, Did the forfeiture of the charter of the turnpike company wholly destroy the character of the road as a public highway. The right of the company to take tolls was ended. Its liability to keep the road in repair was terminated, yet the road as a public highway remained. No judgment or decree had destroyed its character as such. It had been dedicated to public use. * * * The forfeiture of the charter of the turnpike company destroyed the rights of the corporation; yet the road still remained, in fact and in law, a public highway."

In *State v. Hannibal, etc., Co.,* 138 Mo., 332; 39 S. W., 910; 36 L. R. A., 457, the Court said:

"The weight of authority and sound reason concur in holding that, upon the termination of the franchise, the road [a toll road] remains as before, a public highway, wholly freed from the burden of tolls."

In *Blood v. Woods,* 95 Cal., 78; 30 Pac., 129, it was held that a road built by a toll road corporation on the expiration of the statutory period became a free public highway.

So, whether the Sams deed conveyed the fee or only an easement (to which latter construction we strongly incline), in the one case the dedication was complete, and could not be revoked, and in the other unquestionably the easement continues in the public.

In the third place, the charter authorizes the turnpike company "to establish and maintain a turnpike road" (including particularly its location). Upon its establishment abutting property owners acquired the rights of abutting owners. During its life the turnpike company could not have conveyed a strip of its roadway, and thereby effectually annihilated the rights of abutting owners to uninterrupted access to the roadway, bottling them up at the

mercy of the intervening owners of the strip, or compelling them to an unreasonable deviation. Whatever right the turnpike company acquired under the Sams deed, whether the fee-simple title or only an easement, it extended over the entire width of the street, and its obligation to maintain it was equally extensive. If the turnpike company had the right after its death to bargain away any part of the road-way, it had the right during its life to bargain away all of it.

The attorney for the respondents makes a significant statement:

"The roadbed at that time was the hard-surfaced shell road built by the turnpike company at great expense in order to attract business. It was bordered on both sides by shade trees to give it attractiveness, and make it shady and cool, and prevent the blinding glare of bright sunshine on its white surface."

To what extent this grateful relief was provided does not appear. At any rate, it is conclusive of the fact that the turnpike company did not confine its obligations to the roadbed; and, for all that appears to the contrary, it extended to the limits on each side, and was as much a part of the road as its surface. It was not within the power of the turnpike company to interfere with its dedication. Under these circumstances the abutting property owners, who doubtless have built in reliance upon the continuance of these advantages, and especially the right of access to the highway, should not be interfered with.

In view of the foregoing conclusions, the effect of the alleged deed from the turnpike company to Danner and his associates, dated December, 1912, executed 10 years after the alleged contract or agreement and 18 years after the expiration of the charter, and the objections interposed by the defendants to the introduction of that deed in evidence, need not be considered.

The judgment of this Court is that the judgment of the Circuit Court be reversed, and that the case be remanded to that Court for the purpose of entering an order of nonsuit under rule XXVII.